IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:17CR145 |
| vs. | |
| ADNAN GARCIA-GARCIA, | **FINDINGS AND RECOMMENDATION** |
| Defendant. | |

This matter is before the Court on the Motion to Suppress (Filing No. 26) filed by Defendant, Adnan Garcia-Garcia. Defendant filed a brief (Filing No. 27) in support of the motion and the government filed a brief (Filing No. 30) in opposition.

The Court held an evidentiary hearing on the motion on September 7, 2017. Defendant was present with his attorney, Richard McWilliams. The government was represented by Assistant United States Attorney, Martin J. Conboy, IV. Kevin Finn ("Investigator Finn") of the Nebraska State Patrol testified on behalf of the government. Dr. Jeck-Jenard G. Navarrete, a Spanish-English interpreter for the Federal Public Defender, testified on behalf of Defendant. The Court received into evidence the audio/visual recording from Finn's body camera of the encounter between Defendant and Finn (Exhibit 1), consisting of two video files. (TR. 13-14). The Court also received into evidence Dr. Navarrete's Curriculum Vitae (Ex. 101), Dr. Navarrete's transcripts of the encounter between Defendant and law enforcement (Ex. 102 and 103), and Defendant's criminal history (Ex. 104). (TR. 44, 63-64, 70).

A transcript (TR.) of the hearing was prepared and filed on September 19, 2017. (Filing No. 37). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

In the early morning on May 12, 2017, Investigator Finn was working in his capacity in the commercial narcotics interdiction unit at the Omaha bus station. (TR. 7-8). Sometime between 5:45 a.m. and 6:00 a.m., a bus arrived at the Omaha station from California after stopping in Denver. (TR. 8). Investigator Finn was familiar with this bus route and testified that all passengers must exit the bus upon arrival in Omaha before re-boarding or continuing their

travel.  Investigator Finn explained that during this time, baggage handlers pull luggage from the checked baggage area of the bus to determine if luggage needs to be transferred to a new bus or if it will stay on the arriving bus.  (TR. 9-10).

During this process, Investigator Finn observed a newer luggage bag in the checked bag area of the bus.  (TR. 8).  Investigator Finn testified that individuals engaging in narcotics transportation typically use new luggage.  (TR. 11).  Investigator Finn also smelled an odor consistent with a masking agent, such as a car freshener, which is used to hide the scent of narcotics from detection by police or a drug dog.  (TR. 10-11).  Investigator Finn noticed the bag had a luggage tag with Defendant's name and that the bag was en route from Denver to Indianapolis.  (TR. 12).  Investigator Finn testified that Denver is a major source area of controlled substances such as heroin, methamphetamine, and marijuana.  (TR. 24).  Investigator Finn has extensive and ongoing training regarding drug interdiction, and testified that based on his training and experience, the above factors made him suspicious of the bag.  (TR. 10-12).  Investigator Finn noticed that the bag's luggage tag had a Hispanic name and observed Defendant was the only Hispanic male left in the terminal that had no luggage.  (TR. 32).  Investigator Finn approached Defendant to identify whether he was the owner of the bag.  (TR. 12).  Investigator Finn's body camera recorded the encounter.  (Ex. 1).

When Investigator Finn approached Defendant, he identified himself and showed his badge, and told Defendant that he was not under arrest in English.  Investigator Finn then asked Defendant, "habla inglés?"  (Ex. 102).  Defendant indicated he did not speak English, but did speak Spanish.  Investigator Finn is not fluent in Spanish, but can understand basic conversational Spanish and speak broken Spanish.  (TR. 15).  Investigator Finn used some Spanish phrases to ask Defendant where he was coming from and where he was going.  Defendant replied he was traveling from Denver to Indianapolis.  Defendant also stated he was from Mexico.  (Ex. 102; TR. 15).

Investigator Finn asked Defendant for documents.  Defendant provided his boarding pass for the bus, his re-boarding pass, a checked bag ticket, and identification.  (TR. 15-16).  The name on the identification matched the name of the checked bag ticket.  (TR. 16).  Investigator Finn also noticed that Defendant had purchased his bus ticket with cash within thirty hours of departure.  Investigator Finn testified that individuals engaged in transportation of narcotics often

2

will have last minute purchases paid in cash. (TR. 16-17). According to Investigator Finn, thirty hours is considered a last minute purchase. (TR. 17).

At this point, Investigator Finn opened a Google Translate app on his cell phone to assist him in continuing to communicate with Defendant in Spanish. (Tr. 17). While Investigator Finn could not say whether the translation app was accurate, he testified that Defendant did not appear to have any issues understanding what was typed into the translation app, nor did Defendant express an inability to understand the app. (TR. 38-39). Investigator Finn asked Defendant a series of questions using the translation app, and Defendant responded appropriately. (TR. 17-19). Investigator Finn asked Defendant if he had any drugs in his bag using the Spanish phrase, "Tienes alguna droga en tu bolsa?" (TR. 19, 39; Ex. 1 at 4:28-38). Defendant replied "no." (TR. 40). Investigator Finn testified he then asked Defendant for consent to search his bag, and Defendant replied, "si," which means "yes." (TR. 20; Ex. 1 at 4:38-42). Investigator Finn testified the only bag he knew Defendant had at that point was the bag associated with the checked claim ticket that Investigator Finn previously identified in the checked baggage area. (TR. 20).

Investigator Finn and Defendant walked towards the bus and Defendant indicated he wanted to get onto the passenger area of the bus. (TR. 20-21; Ex. 1 at 4:47-51). Investigator Finn pointed to the previously identified bag sitting in the checked baggage area of the bus and asked Defendant if it belonged to him. Defendant indicated through his body language that the checked bag belonged to him. (TR. 21; Ex. 1 at 4:56-5:01). Investigator Finn verified that the luggage tag had Defendant's name and asked Defendant, "permite?" as a request to search the bag. Investigator Finn testified that the body language used by Defendant in response, putting his hands up and taking a step back, indicated to him that Defendant was "ok" with the search of his bag. (TR. 21; Ex. 1 at 5:01-04).

Investigator Finn commenced searching Defendant's bag. Defendant watched the search and made no attempt to stop Investigator Finn. (TR. 25). During the search, Investigator Finn found bundles in the zipper lining of the bag consistent with controlled substances. The substance in the bundles was later identified as heroin. (TR. 21, 23). Investigator Finn handcuffed Defendant and led him to a backroom. A post-arrest search of Defendant's wallet recovered $970 in cash. (TR. 37). Defendant was provided with *Miranda* warnings and he made

no subsequent statements. (TR. 23). After Defendant's arrest, a second bag belonging to him was recovered from the passenger area of the bus. (TR. 24-25).

Investigator Finn testified that at the time of Defendant's consent, Defendant did not appear to be under the influence of drugs or alcohol, appeared to be of average intelligence, responded appropriately to questions posed to him, and was not in custody. Investigator Finn was in plain clothes, used conversational tones, did not brandish his weapon, and made no threats to get Defendant's consent. Investigator Finn was alone when he was conversing with Defendant, although another investigator was standing nearby. (TR. 22-23).

Dr. Navarrete testified at the suppression hearing on behalf of Defendant. Dr. Navarrete has a Juris Doctor degree and a Ph.D. in Linguistics from the University of Nebraska - Lincoln. (TR. 53). Dr. Navarrete is a federally certified court interpreter in Nebraska and an expert in the Spanish language. (TR. 54-55). Dr. Navarrete examined the video recording (Ex. 1) of the encounter between Investigator Finn and Defendant, and transcribed and translated the video (Ex. 102 and 103). (TR. 55-56).

Investigator Finn used the term "bolsa" to refer to Defendant's checked bag when communicating with Defendant. Dr. Navarrete testified that the word "bolsa" is a simple noun which refers to a bag, which could mean a pocket, handbag, grocery bag, or lady's handbag. Dr. Navarrete testified "bolsa" must be accompanied by another word to mean, for instance, "travel bag." (TR. 65). Dr. Navarrete testified that the checked bag he viewed in the video was not a "bolsa," but was rather a "maleta," or "equipaje," a piece of luggage. (TR. 66). Asking to search "tu bolsa" would refer to a small cloth bag. (TR. 68). However, Dr. Navarrete testified on cross-examination that it would be reasonable for a Spanish speaker to understand "bolsa" as referring to a suitcase after pointing to it. (TR. 75).

Dr. Navarrete testified that Defendant appeared to have some confusion regarding the use of the Google translation app upon his review of Ex. 103, which is the audio/visual recording from after the initial search and during the time when Defendant was detained. (TR. 68; Ex. 103). In Dr. Navarrete's opinion, he would not use the Google translation app to explain complicated legal concepts to a foreign individual, and opined the app is "very far from where it should be" with respect to legal concepts or longer sentences. However, Dr. Navarrete testified the app is accurate for general terms or short phrases. (TR. 71-72; 79-80).

4

Defendant filed the instant motion seeking suppression of all evidence and statements obtained as a result of the warrantless search of his checked bag in violation of the Fourth Amendment. Defendant asserts he did not give consent to search his checked bag and therefore any evidence and statements obtained from the search are fruit of the poisonous tree. (Filing No. 26). Defendant primarily argues that due to the language barrier, Defendant believed he was giving Investigator Finn consent to search his carry-on bag, and not his checked bag. (Filing No. 27). Additionally, although Defendant did not raise the argument in his motion or brief, Defendant argued at the hearing that he was unlawfully detained at the time he allegedly gave consent. (TR. 6).

## ANALYSIS

Defendant argues his initial contact with Investigator Finn was not a consensual encounter, but was in an investigatory detention unsupported by reasonable suspicion. (TR. 89). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); see also *Florida v. Bostick*, 501 U.S. 429, 434 (1991)("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage--provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201 (citing *Bostick*, 501 U.S. at 434-35). "[A] detention occurs when 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Correa*, 641 F.3d 961, 965 (8th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Drayton*, 536 U.S. at 201.

The undersigned magistrate judge finds that the initial contact between Investigator Finn and Defendant was a consensual encounter. Investigator Finn, who was wearing plain clothes, approached Defendant in the public bus terminal to ask him simple questions about his travel plans and to look at his travel documents. Investigator Finn identified himself as law enforcement by showing his badge, but told Defendant in English he was not under arrest. See,

5

e.g., *United States v. Poitier*, 818 F.2d 679, 682 (8th Cir. 1987)("[M]ore is required to turn consensual questioning into a *Terry*-type investigative stop than the display of badges, the request for information, and the suggestion that the parties move to a nearby area out of the flow of traffic."). Although another investigator was nearby, Investigator Finn conversed with Defendant alone. Their entire conversation took place in conversational tones, and at no point did Investigator Finn threaten Defendant, use an authoritative tone, or brandish his weapon. It was only after Investigator Finn recovered from Defendant's checked bag the packages that appeared to be controlled substances that Defendant was handcuffed and brought to a back room of the bus station, at which point the consensual encounter ended. Under the circumstances, a reasonable person in Defendant's position would have felt free to leave up until the point he was handcuffed, and therefore the initial encounter was not a detention. See, e.g., *Drayton*, 536 U.S. at 204 (finding no detention when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of [the bus] exits, no threat, no command, not even an authoritative tone of voice.").

Defendant next challenges the validity of his consent to search his checked bag. "To satisfy the Fourth Amendment's protection from unreasonable searches, 'the subject of a search [must have given] consent that was the product of an essentially free and unconstrained choice.'" *Correa*, 641 F.3d at 966 (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). Whether consent was voluntarily given is determined from the totality of the circumstances. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Factors for the court to consider include:

> personal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*United States v. Va Lerie*, 424 F.3d 694, 709 (8th Cir. 2005) (quoting *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001). "[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'" *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) (quoting *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)).

The undersigned magistrate judge finds that a reasonable officer in Investigator Finn's position would have believed Defendant consented to the search of the checked bag. At the outset of Investigator Finn's contact with Defendant, Defendant indicated he did not speak English, but using a translation app and limited conversational Spanish, Investigator Finn was able to communicate simple questions to Defendant. Defendant's Spanish language expert, Dr. Navarrete, testified that although the translation app is not appropriate to explain complicated legal concepts to a foreign individual, the app is accurate for general terms or short phrases. Defendant's appropriate responses during his initial conversation with Investigator Finn indicated Defendant understood what was being asked of him with the aid of the translation app. Defendant answered questions about who he was, where he was going, where he came from, and provided his travel documents and identification to Investigator Finn. Defendant denied having drugs in his bag, and replied "si" when Investigator Finn initially asked to search "tu bolsa." Investigator Finn testified that during his interaction with Defendant, Defendant did not appear to be under the influence of drugs or alcohol and appeared to be of average intelligence. Upon the Court's review of Exhibit 1 and its observations of Investigator Finn's testimony, the Court finds Investigator Finn's testimony to be credible.

Defendant argues that due to the language barrier and the Spanish terms used by Investigator Finn, specifically using "bolsa" to refer to bag, Defendant did not consent to the search of his checked bag, and instead thought he was consenting to his carry-on bag. Dr. Navarrete explained that "bolsa" is a simple noun which refers to any kind of bag, including a pocket, handbag, grocery bag, or lady's handbag, and must be accompanied by another word to refer to a specific type of bag. According to Dr. Navarrete, asking to search "tu bolsa" would refer to a small cloth bag. Dr. Navarrete's testimony lends credence to the Defendant's position that Defendant thought he was consenting to a search of his carry-on bag, particularly when combined with Defendant's gesturing to the passenger area of the bus when they approached the bus. However, Dr. Navarrete also testified that it would be reasonable for a Spanish speaker to understand "bolsa" as referring to a suitcase after pointing to it, which is ultimately what occurred in this case.[1]

---

[1] Of course, the dispute before the Court could largely have been avoided had a properly trained and certified interpreter been utilized during the criminal interdiction operation at the bus station and, in addition or perhaps instead, a written consent form in Spanish been used to ensure that Defendant fully understood the consent request and to clearly document his consent. While use of such a form has not been held to be necessary, it certainly

Moreover, as stated above, the Court's inquiry is "not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'" *Rodriguez*, 834 F.3d at 940. Immediately after Defendant gestured to the passenger area of the bus, Investigator Finn pointed to the checked bag and asked Defendant if it was his bag. Investigator Finn verified that the luggage tag had Defendant's name on it, and Defendant nodded to indicate it was his bag. Investigator Finn asked, "permite?" In response, Defendant put up his hands and stepped back. As Investigator Finn searched the checked bag, Defendant stood by silently and motionlessly, and took no affirmative action or otherwise indicated a desire for the search to stop. Investigator Finn reasonably could infer from Defendant's gesture prior to the search, and subsequent conduct during the search, that he provided consent to the search of his checked bag. See *Rodriguez*, 834 F.3d at 940 (quoting *Pena-Ponce*, 588 F.3d at 584)( "Consent may be inferred from the defendant's 'words, gestures, or other conduct[.]'"); and *Correa*, 641 F.3d at 967 (concluding defendant's "contemporaneous reaction to the search--compliance and silence--was consistent with consent.").

Additionally, as discussed above, at the time Defendant provided this consent, he was in a public place, was not confronted by multiple officers, was not threatened, and was not handcuffed or detained in anyway. The entire duration of Investigator Finn's encounter with Defendant from the initial contact until the search took place was only four and a half minutes. (Ex. 1 at 0:33-5:03). Upon review of the record, the undersigned magistrate judge concludes that the totality of the circumstances reflects Defendant's consent was voluntary, and that a reasonable officer in Investigator Finn's position would believe Defendant consented to the search. See *United States v. Smith*, 260 F.3d 922, 925 (8th Cir. 2001)(finding defendant voluntarily consented to search of his luggage at bus station where "the encounter occurred in a

---

constitutes a best practice in addressing language barriers, protects against allegations of Fourth Amendment rights violations, and aids in the administration of justice. See, e.g., *United States v. Cedano-Medina*, 366 F.3d 682, 687 (8th Cir. 2004)("Given the apparent confusion during their conversation arising from [the defendant's] limited English proficiency, the use of a Spanish consent form here would certainly have been desirable, but there is no bright-line rule requiring the use of such forms in situations like this."). A consent form can also advise an individual of the right to deny consent or to revoke consent once given. Although the Supreme Court has "repeatedly 'rejected . . . the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search,'" *United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002)(quoting *Drayton*, 536 U.S. at 206), knowledge of the right to refuse consent is a factor relevant to the voluntariness analysis. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). While it is fairly clear that consent forms are readily available to law enforcement, as was in this case, see TR. 45-46, it is not clear as to why the forms are not possessed and used by officers during investigations.

public place during daylight hours, . . . the entire episode leading up to the search lasted only a few minutes, [the defendant] expressed no reluctance to speak with the officers or to permit the search of his bag, and [where], at the very least, [the defendant] indicated his consent to the search by raising his hands.").

In sum, Investigator Finn's initial contact with Defendant was a consensual encounter and not an investigatory detention, Defendant's consent was voluntary, and a reasonable officer in Investigator Finn's position would reasonably believe Defendant consented to the search. Investigator Finn lawfully searched the bag checked in Defendant's name and any evidence and statements obtained as a result of the search are therefore not fruit of the poisonous tree. Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Laurie Smith Camp that Defendant's Motion to Suppress (Filing No. 26) be denied.

Dated this 17th day of October, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.